AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means                    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>THE PREMISES LOCATED AT:<br>13271 Chestnut Street, Westminster, California 92683 | )<br>)<br>)  Case No. 8:21-MJ-00273<br>)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of  _____.

Date and time issued:    _____          _____

City and state:      <u>Santa Ana, CA</u>_____          <u>Honorable Autumn D. Spaeth</u>

*Judge's signature*

*Printed name and title*

AUSA: <u>Ali Moghaddas</u>_____

| **Return** | | |
|---|---|---|
| Case No.: 8:21-MJ-00273 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Jessica Salo, being duly sworn, declare and state as follows:

### I.   <u>INTRODUCTION</u>

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since November 2014.  I am currently assigned to the Orange County Joint Terrorism Task Force.  My duties include investigating violations of the laws of the United States, specifically investigations related to domestic and foreign terrorism.  As a Special Agent, I have received both formal and informal training from the FBI regarding domestic and foreign terrorism investigations.

2.   Through my training and experience with the FBI, I am familiar with the methods of operation that individuals associated with domestic and foreign terrorist organizations employ – including their use of social media and online platforms such as Facebook, Instagram, and YouTube – to communicate with associates regarding their ideology, to organize actions on behalf of their organizations, and to bring attention to their political and social agendas.  As an FBI Special Agent, I have also participated in the execution of multiple search warrants, including federal search warrants executed at physical residences in cases involving domestic terrorism.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of warrants to search: (1) 13271 Chestnut Street, Westminster, California 92683 (the "SUBJECT RESIDENCE"), as described more fully in Attachment A-1, which is incorporated herein by reference; (2) the person of KEVIN LOUIS GALETTO ("GALETTO"), as described more fully in Attachment A-2, which is incorporated herein by reference; (3) an orange 2000 Ford pickup truck bearing California license plate number 6J62822 ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-3, which is incorporated herein by reference; (4) a burgundy 2017 Chevrolet Volt bearing California license plate number 7VGX025 ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-4, which is incorporated herein by reference; and (5) a 2009 Cougar RV trailer bearing California license plate number 1LT8982 ("SUBJECT VEHICLE 3" and, together with SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2, the "SUBJECT VEHICLES"), as described more fully in Attachment A-5, which is incorporated herein by reference, for evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated herein by reference: 18 U.S.C. § 111(a)(1) (Assaulting, Resisting or Impeding Officers); 18 U.S.C. § 231(a)(3) (Civil Disorders); 18 U.S.C. § 1512(c)(2) (Obstructing an Official Proceeding); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) (collectively, the "Subject Offenses").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

### III.  SUMMARY OF PROBABLE CAUSE

5.   GALETTO is an Orange County resident.  On January 6, 2021, GALETTO was part of a violent mob that rioted at the United States Capitol in Washington D.C. while a joint session of Congress met to certify the results of the 2020 Presidential Election.

6.   GALETTO was captured in body-worn camera footage from two Metropolitan Police Department ("MPD") officers inside the Lower West Terrace tunnel of the Capitol building on January 6, 2021.  This footage shows GALETTO with his arms extended and pressed up against MPD officer shields.  The footage also shows a scuffle involving GALETTO in which an MPD officer was knocked to the ground.

7.   On April 20, 2021, the Honorable Zia M. Faruqui, United States Magistrate Judge in the District of Columbia, issued a criminal complaint and arrest warrant charging GALETTO with 18 U.S.C. § 111(a) (Assaulting, Resisting, or Impeding

Certain Officers or Employees); 18 U.S.C. § 231(a)(3)
(Obstruction of Law Enforcement During Civil Disorder); 18
U.S.C. § 1512(c)(2) (Obstruction of Justice); 18 U.S.C.
§ 1752(a)(1), (2), and (4) (Knowingly Entering or Remaining in
any Restricted Building or Grounds Without Lawful Authority,
Knowingly Committing an Act of Physical Violence in any
Restricted Building or Grounds); and 40 U.S.C. § 5104(e)(2)(D),
(E), (F), and (G) (Violent Entry and Disorderly Conduct on
Capitol Grounds).  The criminal complaint, arrest warrant, and
affidavit in support thereof are attached hereto as Exhibit 1
and incorporated herein by reference.

    8.   As detailed below, there is probable cause to believe
that GALETTO lives at the SUBJECT RESIDENCE, drives the SUBJECT
VEHICLES, and that additional evidence of the Subject Offenses –
including items and digital device(s) used by GALETTO during the
riot at the U.S. Capitol – will be found inside.

### IV.   STATEMENT OF PROBABLE CAUSE

### A.   Background – The U.S. Capitol on January 6, 2021

    9.   The United States Capitol Police ("USCP"), the FBI,
and assisting law enforcement agencies are investigating a riot
and related offenses that occurred at the United States Capitol
Building, located at 1 First Street, NW, Washington, D.C., 20510
at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

    10.  At the U.S. Capitol, the building itself has 540 rooms
covering 175,170 square feet of ground, roughly four acres.  The
building is 751 feet long (roughly 228 meters) from north to
south and 350 feet wide (106 meters) at its widest point.  The

U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

11.  The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

12.  On January 6, 2021, a joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the public.

13.  A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

14.     The joint session began at approximately 1:00 p.m. in the House Chamber.

15.     At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber. Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

16.  As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

17.  At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

18.  At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



19.   Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

20.   At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

21.   Also at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

22.   At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

23.   At around 2:47 p.m., subjects broke into the United States Senate Chamber.  Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



24.   After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where

the fuck is Nancy?"  Based upon other comments and the context,
law enforcement believes that the "Nancy" being referenced was
the Speaker of the House of Representatives, Nancy Pelosi.



25.  A subject left a note on the podium on the floor of
the Senate Chamber.  This note, captured by the filming
reporter, stated "It's Only A Matter of Time Justice is Coming."



26.   During the time when the subjects were inside the
Capitol building, multiple subjects were observed inside the
U.S. Capitol wearing what appears to be, based upon my training
and experience, tactical vests and carrying flex cuffs.  Based
upon my knowledge, training, and experience, I know that flex
cuffs are a manner of restraint that are designed to be carried
in situations where a large number of individuals were expected
to be taken into custody.





27.   At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

28.   At about 3:25 p.m., law enforcement officers cleared the Senate floor.

29.   Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

30.   Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.   In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.   The proceedings

resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

31.  Beginning around 8:00 p.m., the Senate resumed work on the Certification.

32.  Beginning around 9:00 p.m., the House resumed work on the Certification.

33.  Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

34.  During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

35.  Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

13

36.   Many subjects seen on news footage in the area of the
U.S. Capitol are using a cell phone in some capacity.  It
appears some subjects were recording the events occurring in and
around the U.S. Capitol and others appear to be taking photos,
to include photos and video of themselves after breaking into
the U.S. Capitol itself, including photos of themselves damaging
and stealing property.  As reported in the news media, others
inside and immediately outside the U.S. Capitol live-streamed
their activities, including those described above as well as
statements about these activities.

37.   Photos below, available on various publicly available
news, social media, and other media show some of the subjects
within the U.S. Capitol during the riot.  In several of these
photos, the individuals who broke into the U.S. Capitol can be
seen holding and using cell phones, including to take pictures
and/or videos:







**B.    GALETTO's Presence at the Riot**

38.   On April 20, 2021, in the District of Columbia, GALETTO was charged by complaint with 18 U.S.C. § 111(a) (Assaulting, Resisting, or Impeding Certain Officers or Employees); 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder); 18 U.S.C. § 1512(c)(2)

(Obstruction of Justice); 18 U.S.C. § 1752(a)(1), (2), and (4) (Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, Knowingly Committing an Act of Physical Violence in any Restricted Building or Grounds); and 40 U.S.C. § 5104(e)(2)(D), (E), (F), and (G) (Violent Entry and Disorderly Conduct on Capitol Grounds).  See Exhibit 1.  By way of summary, the affidavit in support of the criminal complaint sets forth the following facts, among others:

      a.   After the January 6, 2021 riot at the Capitol, the FBI reviewed hours of video that was obtained via social media, law enforcement body cameras, and surveillance cameras located on the U.S. Capitol grounds.  In these videos, GALETTO is seen on U.S. Capitol video surveillance at the Lower West Terrace tunnel entrance wearing a black Trump baseball hat, black headband, tan jacket, and a gray hoodie.  GALETTO was one of the first individuals to enter the tunnel entrance and was met by a large police presence denying the rioters entry into the Capitol (Ex. 1, Statement of Facts at 3);

      b.   Later, MPD officer body camera footage captured GALETTO with his arms extended and pushing against MPD officer shields.  Minutes later, GALETTO is seen involved in a scuffle with an MPD officer who is eventually knocked to the ground. The following still photos from the MPD officer's body camera show GALETTO both pushing against the officer's riot shield and, once the officer is knocked to the ground, kneeling over the officer:





(id. at 3-7);

c.    The MPD officer involved in the foregoing incident filed an Injury or Illness Report on January 7, 2021, which stated, among other things, that his helmet was ripped off his head and he was hit twice by an unknown object.  As a result, the officer sustained a head injury (id. at 8);

d.    In a YouTube clip entitled "UNBELIEVABLE Footage / Trump Supporters Battle Cops Inside the Capitol," GALETTO was observed exiting the Lower West Terrace tunnel and can be heard shouting to the crowd of rioters outside the tunnel, "More people!"  (id. at 7);

e.    According to records obtained through a search warrant which was served on Verizon on or about January 6, 2021, in and around of the time of the incident, a cellular phone associated with GALETTO was identified as having utilized a cell site within a geographic area that included the interior of the United States Capitol building (id. at 3);

f.    Further, subpoena results from American Airlines and Citibank revealed that GALETTO traveled to the Washington D.C. area on or about January 5, 2021 and returned to Los Angeles on or about January 7, 2021 (id.).

### C.    GALETTO Resides at the SUBJECT RESIDENCE and Drives the SUBJECT VEHICLES

39.   According to California Department of Motor Vehicles records, GALETTO resides at 13271 Chestnut Street, Westminster, California 92683.  Based on basic Internet research and information provided by an FBI surveillance team, I know that this address corresponds to a single-story family residence.

Further, based on a government database records check, I know that GALETTO and his wife are associated with this address. This address is described herein and within Attachment A-1 as the SUBJECT RESIDENCE.

40.   On February 22 and 23, 2021, an FBI surveillance team observed the SUBJECT VEHICLES parked in the driveway of the SUBJECT RESIDENCE.  These vehicles are described herein and within Attachment A-3 through A-5 as SUBJECT VEHICLES 1 through 3.  The SUBJECT VEHICLES are each registered to GALETTO at the SUBJECT RESIDENCE.

41.   Between March 5 and 9, 2021, the FBI parked a mobile surveillance vehicle on a public street in front of the SUBJECT RESIDENCE.  On March 6, 2021, GALETTO was observed exiting the SUBJECT RESIDENCE and driving SUBJECT VEHICLES 1 and 2 out of the SUBJECT RESIDENCE's driveway.  GALETTO appeared to be setting up for a garage sale in the driveway of the SUBJECT RESIDENCE.  At the end of the garage sale, GALETTO returned SUBJECT VEHICLES 1 and 2 to the driveway of the SUBJECT RESIDENCE and reentered the SUBJECT RESIDENCE.  Later, GALETTO was seen exiting the SUBJECT RESIDENCE and departing with his wife in SUBJECT VEHICLE 2.

42.   On March 7, 2021, GALETTO and his wife were observed exiting the SUBJECT RESIDENCE and driving away in SUBJECT VEHICLE 2.  Additionally, on March 9, 2021, GALETTO was observed exiting the SUBJECT RESIDENCE and departing alone in SUBJECT VEHICLE 2 with a briefcase and lunchbox in hand.

43.   On March 13, 2021, an FBI surveillance team observed GALETTO in front of the SUBJECT RESIDENCE selling miscellaneous items at what appeared to be another garage sale.  The photograph below was taken during this surveillance.



44.   Investigators recently learned that the SUBJECT RESIDENCE was listed for sale and is in fact in escrow. However, as of the date of this filing, GALETTO is still believed to occupy the SUBJECT RESIDENCE.  Specifically, on April 18, 2021, the FBI again parked a mobile surveillance vehicle on a public street in front of the SUBJECT RESIDENCE and observed, among other things, the SUBJECT VEHICLES parked in the driveway of the SUBJECT RESIDENCE.

**D.   USE OF DIGITAL DEVICES AT THE CAPITOL RIOTS**

45.   Based on my training and experience, I know that individuals traveling outside of their cities of residence to attend large events, such as the demonstration on January 6,

2021 in Washington D.C., typically carry their cell phones with
them in order to coordinate their travel plans, use web-based
applications to get directions to unfamiliar locations, and
communicate with friends and family both at the event and at
home.  Furthermore, based on my training and experience, I know
that persons who engage in the Subject Offenses will frequently
use digital devices, including cell phones, computers, tablets,
and other devices, to conduct their criminal activities, take
(and store) photographs and videos in order to memorialize their
illegal activities, and maintain contact with others involved
with the planning, targeting, and execution of the Subject
Offenses.

46.  In my training and experience, I know that smart
phones are the single most common way in which people now take
photographs and instantly share them with others.  As detailed
below, in my training and experience, camera and messaging
applications on smart phones allow users to take photographs and
video- such as those that were taken during the Capitol Riots -
and communicate with other users.

47.  Based on my review of public news reports following
the events at the U.S. Capitol on January 6, 2021, I know that
many individuals involved in the incident used their cell phones
to take photographs and videos, as well as to share them on
social media applications, both during and after the incident.
According to government and open source databases, GALETTO
previously maintained accounts on multiple social media
applications, including DLive, Facebook, Twitter, Skype, and

WhatsApp.  I know, based on my training and experience, that
these Internet-based applications require digital devices to
operate and that photographs and videos that are posted to
social media are also generally stored on the digital devices
themselves.  Such evidence is therefore likely to be found on
the digital devices used by GALETTO.  These devices are also
likely to have other evidence of GALETTO's activities, including
evidence of his location in the hours and days leading up to and
after the Capitol Riots, Internet searches he conducted
regarding the riots, and communications with other individuals
regarding the riots.  These devices are also likely to have
other evidence of the commission of the Subject Offenses by
other rioters who were near GALETTO while GALETTO recorded
activities at and near the Capitol.

48.  Based on my training and experience, I know that
individuals typically store their digital devices, such as cell
phones, tablets, and computers, at their personal residences,
vehicles, and/or on their persons, where the devices can be
easily accessed and used.  Moreover, in this case, on January 6,
2021, GALETTO wore uniquely identifiable clothing, i.e., a black
Trump baseball hat, black headband, tan jacket, gray hoodie, and
a black backpack.  In my training and experience, individuals
who engage in interstate travel to riot and damage federal
property often return to their homes with the same
clothing/items that they wore/used when they committed the
offenses.  These items can prove that the individual shown in
images captured on social media during a riot is the same person

who lives at a given residence or used a particular item during the riot.

49.   In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.  Thus, there is reason to believe that evidence of the offense that originally resided on GALETTO's cell phone(s) may also be saved to other digital devices. Moreover, as widely reported in the news media, many individuals committing the Subject Offenses posted videos, photos, and commentary about their participation in the Capitol Riots, essentially bragging about their involvement.  Based on that, there is also probable cause to believe that evidence related to these offenses may have been transferred to and stored on digital devices beyond the particular digital device GALETTO possessed during the riot.

50.   Accordingly, I believe that evidence of the Subject Offenses, including digital devices and other items used by GALETTO to prepare for, commit, document, and discuss the Subject Offenses, are likely to be found on GALETTO's person, inside the SUBJECT RESIDENCE, and within the SUBJECT VEHICLES.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

51.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

 c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

 d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

52.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

53.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

   c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress KEVIN LOUIS GALETTO's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of KEVIN LOUIS GALETTO's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//
//
//
//
//
//
//
//

27

## VI. <u>CONCLUSION</u>

54.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting or Impeding Officers); 18 U.S.C. § 231(a)(3) (Civil Disorders); 18 U.S.C. § 1512(c)(2) (Obstructing an Official Proceeding); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) will be found at the SUBJECT RESIDENCE, on the person of GALETTO, and within the SUBJECT VEHICLES, as described in Attachments A-1 through A-5.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 20th day of
April, 2021.


_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br><br>Kevin Louis Galetto<br>DOB: 3/18/1960<br><br>―――――――――――――<br>*Defendant(s)* | ) Case: 1:21–mj–00385<br>) Assigned To : Faruqui, Zia M.<br>) Assign. Date : 4/20/2021<br>) Description: COMPLAINT W/ ARREST WARRANT<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 6, 2021_____ in the county of _____ in the

_____ in the District of ____Columbia____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|

18 U.S.C § 111(a) - Assaulting, Resisting, or Impeding Certain Officers or Employees,
18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder,
18 U.S.C. § 1512(c)(2) - Obstruction of Justice,
18 U.S.C. § 1752(a)(1), (2), and (4) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, Knowingly Committing an Act of Physical Violence in any Restricted Building or Grounds,
40 U.S.C. § 5104(e)(2)(D), (E), (F), & (G) - Violent Entry and Disorderly Conduct on Capitol Grounds.

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

David DiMarco, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   _____04/20/2021_____

_____
*Judge's signature*

City and state:   _____Washington, D.C._____

Zia M. Faruqui, U.S. Magistrate Judge
*Printed name and title*

Case 8:21-mj-00273-DUTY   Document 1-1   

Case: 1:21-mj-00385
Assigned To : Faruqui, Zia M.
Assign. Date : 4/20/2021
Description: COMPLAINT W/ ARREST WARRANT

## STATEMENT OF FACTS

Your Affiant, David J. DiMarco, is a Special Agent with the Federal Bureau of Investigation (FBI) and has been so employed since 2004. Specifically, I am assigned to the Washington Field Office (WFO), Northern Virginia Violent Crimes Task Force. I am currently tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As an FBI Special Agent, I have participated in numerous investigations involving unlawful narcotics distribution, organized crime, bank robberies, homicides, kidnappings, threat cases, unlawful firearm cases and other violent criminal offenses.  In these investigations, I have been involved in the application for and execution of numerous arrest warrants related to the aforementioned criminal offenses.  Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by violent criminal offenders.  I have been a sworn law enforcement officer during all times herein.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification were allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice

President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

### FACTS RELATED TO KEVIN LOUIS GALETTO

During the course of my investigation, I reviewed several hours of video that was obtained via social media, law enforcement body cameras, and surveillance cameras located on the U.S. Capitol grounds.  I was assigned to identify and locate the subject who was listed as BOLO (Be On the Look-Out) 146.

Captured from a post on Twitter from #Seditionhunters:



A possible subject resembling KEVIN LOUIS GALETTO, DOB 03/18/1960 was identified by Customs Border Patrol (CBP) who conducted a facial comparison query of images maintained in or accessed through CBP systems at the request of the FBI to identify possible persons being investigated for criminal activities on January 6, 2021.

**Review of Records**

Additional research was conducted on GALETTO in law enforcement databases, open source and social media queries, and subpoenaed records. The records revealed GALETTO is currently residing in Westminster, California.  Database results on GALETTO also revealed cellular telephone **714-894-9561** was utilized by GALETTO in a 2013 United States Passport Application.

Subpoena results received from Google revealed GALETTO's email address utilized recovery phone number **714-894-9561**.  Additionally, Google results on GALETTO's IP Address revealed that on January 06, 2021, GALETTO logged into Google related services multiple times from Fairfax, Virginia.

According to records obtained through a search warrant which was served on Verizon on 01/06/2021, in an around of the time of the incident, the cellular phone associated with **714-894-9561** was identified as having utilized a cell site consistent with providing service to a geographic area that included the interior of the United States Capitol building.

Subpoena results from American Airlines revealed that on January 05, 2021, GALETTO flew from Los Angeles International (LAX) to Charlotte Douglas (CLT) to Baltimore Washington International (BWI).  Subpoena results also revealed that on January 07, 2021, GALETTO departed BWI to CLT to LAX.  American Airlines records revealed cellular telephone number **714-894-9561** as a contact for GALETTO.

Subpoena results from GALETTO's Citibank credit card revealed GALETTO secured a reservation at the St. Gregory Hotel in Washington DC from January 05, 2021 to January 07, 2021.  Based on records provided by Citibank, a charge in the amount of $462.10 from the St. Gregory Hotel was incurred on January 07, 2021.

**Review of Video Surveillance**

At approximately 2:40 PM on January 6, 2021, GALETTO was first seen on U.S. Capitol video surveillance at the Lower West Terrace (LWT) tunnel entrance.  GALETTO was wearing a black Trump baseball hat, black headband, tan jacket, and a gray hoodie as he entered the tunnel.  GALETTO was one of the first individuals to enter the tunnel entrance and was met by a large police presence denying the rioters entry into the Capitol.

Evidence from Body Worn Camera (BWC) of a Metropolitan Police Department (MPD) Officer B.S. captured GALETTO at the entryway doors of the LWT tunnel.  At approximately 2:43:26, BWC captured GALETTO with his arms extended and pressed up against MPD officer shields. At approximately 2:44:14 PM, BWC captured GALETTO's body pressed up against

officer shields.  At approximately 2:46:20 PM, the BWC captured a scuffle involving GALETTO.  Officer B.S. is knocked to the ground.  At approximately 2:46:28 PM, BWC captured GALETTO on one knee with a hand on the ground. At approximately 2:47:02 PM, GALETTO rises to his feet and retreats from the area of the tunnel.

The following still photo is from MPD Officer B.S.'s BWC at 2:44:01 and shows GALETTO pushing on the officer's shield:



The following still photo is from MPD Officer B.S.'s BWC at 2:46:36 while GALETTO is still on his knee over Officer B.S.:



Evidence from BWC of a second MPD Officer, Sergeant J.M., captured GALETTO pushing against officer shields which continued to approximately 2:44:28 PM. At approximately 2:45 PM, BWC footage captured GALETTO with his back pushed up against officer shields.

The following still photo is from MPD Sergeant J.M.'s BWC at 2:44:12 where he is pushing on officer shields:



The following still photo is from MPD Sergeant J.M.'s BWC approximately 8 seconds later at 2:44:18, and he is continuing to push on officer shields:



In a YouTube clip entitled "UNBELIEVABLE Footage / Trump Supporters Battle Cops Inside the Capitol," GALETTO was observed exiting the tunnel of the LWT entryway. At approximately 27 seconds in the video, GALETTO does not appear to be wearing his black colored "Trump" baseball hat or headband.  At approximately 51 seconds into the video, GALETTO is heard shouting to the crowd of rioters outside the tunnel, "More people!"  Based on my observations I believe GALETTO attempted to summon more rioters to the LWT tunnel entryway to penetrate the police line.

GALETTO captured in the YouTube clip exiting the LWT tunnel:



**Review of Police Reports**

On January 07, 2021, MPD Officer B.S. filed an Injury or Illness Report which documented injuries he received while responding to the Capitol Riots the previous day. Specifically, B.S.'s helmet was ripped off his head and he was hit twice by an unknown object. As a result, Officer B.S. sustained a head injury while trying to hold a shield defense against several individuals on January 06, 2021.

Based on Officer B.S.'s injury report an Assault on a Police Officer investigation was initiated by MPD Investigator T.G.

On January 15, 2021, Investigator T.G. reviewed Officer B.S.'s BWC footage and observed an older white male with a white/gray mustache and goatee standing in front of Officer B.S. The older white male was wearing a tan coat with a gray hooded sweatshirt underneath, a black knit winter hat with white block letter, yellow and black ski-type gloves and a black backpack.

According to T.G.'s review of Officer B.S.'s BWC, the older white male was captured with his face pressed up against B.S.'s riot shield with both of his hands/gloves clearly holding and pulling the top of Officer B.S.'s shield.  Within a few seconds, the back of the white male's backpack is pressed up against Officer B.S.'s riot shield blocking the view of Officer B.S.'s BWC.  Yelling and arguing can be heard while Officer B.S.'s BWC is blocked. Officer B.S.'s BWC view changes when Officer B.S. drops towards the bottom of his riot shield coinciding

with the moments Officer B.S. stated his helmet was ripped off his head and he was struck two times on the head causing him to fall down.

Based on the information above a Be on the Look Out/ Attempt to Identify flyer was initiated by the MPD.  The following photographs were included in the flyer:



## Physical Surveillance

FBI Agents from the Los Angeles Field Division learned GALETTO would be hosting a garage sale at his residence in Westminster, California.  On March 13, 2021, Agents observed GALETTO in front of his residence selling miscellaneous items.  During the garage sale Agents were able to take several photographs of GALETTO.  Based on the Agent's observations and photographs from the March 13, 2021 surveillance, as well as the Agent's review of photos and videos depicting the Capitol Incursion, GALETTO was identifiable with BOLO-146.

March 13,2021 Garage Sale surveillance photograph:



Based on the foregoing, your Affiant submits that there is probable cause to believe that KEVIN LOUIS GALETTO violated 18 U.S.C. § 111(a), which makes it a crime to forcibly assault or interfere with any person designated in section 1114 of this title 18 while engaged in or on account of the performance of official duties and involved physical contact.  Persons designated within section 1114 include any person assisting an officer or employee of the United States in the performance of their official duties.

Your Affiant submits that there is probable cause to believe that KEVIN LOUIS GALETTO violated 18 U.S.C. 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

Your Affiant submits there is also probable cause to believe that KEVIN LOUIS GALETTO violated 18 U.S.C. § 1512(c)(2), which makes it a crime to obstruct, influence, or impede any official proceeding, or attempt to do so. Under 18 U.S.C. § 1515, congressional proceedings are official proceedings.

Your Affiant submits there is also probable cause to believe that KEVIN LOUIS GALETTO violated 18 U.S.C. § 1752(a)(1), (2) and (4), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds;] or attempts or conspires to do so.  For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your Affiant submits there is also probable cause to believe that KEVIN LOUIS GALETTO  violated 40 U.S.C. § 5104(e)(2)(D), (E), (F) & (G), which makes it a crime to willfully and knowingly; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (E) obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings; (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

Further your Affiant sayeth not,

David J. DiMarco
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 20th day of April 2021.

ZIA M. FARUQUI
U.S. MAGISTRATE JUDGE

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br><br>Kevin Louis Galetto<br><br>_____<br>*Defendant* | ) Case: 1:21–mj–00385<br>) Assigned To : Faruqui, Zia M.<br>) Assign. Date : 4/20/2021<br>) Description: COMPLAINT W/ ARREST WARRANT<br>) |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)* _____ Kevin Louis Galetto _____ ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment     ❏ Superseding Indictment     ❏ Information     ❏ Superseding Information     ☒ Complaint
❏ Probation Violation Petition     ❏ Supervised Release Violation Petition     ❏ Violation Notice     ❏ Order of the Court

This offense is briefly described as follows:

18 U.S.C § 111(a) - Assaulting, Resisting, or Impeding Certain Officers or Employees;
18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder;
18 U.S.C. § 1512(c)(2) - Obstruction of Justice;
18 U.S.C. § 1752(a)(1), (2), and (4) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without
Lawful Authority, Knowingly Committing an Act of Physical Violence in any Restricted Building or Grounds;
40 U.S.C. § 5104(e)(2)(D), (E), (F), & (G) - Violent Entry and Disorderly Conduct on Capitol Grounds.

Date:     ____04/20/2021____          _____
                                                                              *Issuing officer's signature*

City and state:     ____Washington, D.C.____          _____
                                                                              Zia M. Faruqui, U.S. Magistrate Judge
                                                                              *Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____<br>at *(city and state)* _____ .<br><br>Date: _____          _____<br>                                                                *Arresting officer's signature*<br><br>                                                                _____<br>                                                                *Printed name and title* |

**<u>ATTACHMENT A-1</u>**

<u>RESIDENCE TO BE SEARCHED</u>

The SUBJECT RESIDENCE is located at 13271 Chestnut Street, Westminster, California 92683.  The SUBJECT RESIDENCE is a single-story family residence with an attached garage and is blue with a white trim.  The house number "13271" can be seen on a brick beam near the entryway of the SUBJECT RESIDENCE.

The SUBJECT RESIDENCE includes all guesthouses, annexes, attics, porches, garages, carports, driveways, outside yard (including all sheds or storage space), mailboxes, trash containers, and debris boxes that are assigned to the SUBJECT RESIDENCE.  The SUBJECT RESIDENCE also includes all vehicles, parked in the garage or driveway of the SUBJECT RESIDENCE.



## **ATTACHMENT A-2**

<u>PERSON TO BE SEARCHED</u>

The person of KEVIN LOUIS GALETTO, date of birth March 18,
1960, approximately 6'2" tall and approximately 215 pounds, with
gray hair and hazel eyes.  The search of KEVIN LOUIS GALETTO
shall include any items on his person or within his immediate
vicinity and control that are capable of containing items to be
seized, including clothing pockets, digital devices, and
containers (such as briefcases, backpacks, boxes, and purses).
The search shall not include a strip search or a body cavity
search.



**ATTACHMENT A-3**

PROPERTY TO BE SEARCHED

  SUBJECT VEHICLE 1 is an orange 2000 Ford pickup truck
bearing California license plate number 6J62822 and vehicle
identification number 1FTNX20S3YEEl1843, which is registered to
GALETTO at the SUBJECT RESIDENCE.

## <u>ATTACHMENT A-4</u>

<u>PROPERTY TO BE SEARCHED</u>

SUBJECT VEHICLE 2 is a burgundy 2017 Chevrolet Volt bearing California license plate number 7VGX025 and vehicle identification number lG1RC6S53HU155441, which is registered to GALETTO at the SUBJECT RESIDENCE.

**ATTACHMENT A-5**

PROPERTY TO BE SEARCHED

    SUBJECT VEHICLE 3 is a 2009 Cougar RV trailer bearing California license plate number 1LT8982 and vehicle identification number 4YDF276259C502422, which is registered to GALETTO at the SUBJECT RESIDENCE.

## ATTACHMENT B

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting or Impeding Officers); 18 U.S.C. § 231(a)(3) (Civil Disorders); 18 U.S.C. § 1512(c)(2) (Obstructing an Official Proceeding); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) (collectively, the "Subject Offenses"), namely:

a.    Evidence concerning any plans to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b.    Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c.    Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

d.    Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

e.   Evidence relating to any conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f.   Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.   Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.   Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties at the United States Capitol on January 6, 2021;

i.   Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.   Evidence of any conspiracy, planning, or preparation to commit the Subject Offenses;

k.   Evidence concerning efforts after the fact to conceal evidence of the Subject Offenses, or to flee prosecution for the same;

l.   Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law enforcement, such as pepper spray or smoke grenades;

m.    Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.    Evidence of the state of mind of GALETTO and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the Subject Offenses and/or the riot and civil disorder that occurred at the United States Capitol on January 6, 2021;

o.    Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation, including the Subject Offenses; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including the Subject Offenses, such as records that help reveal their whereabouts;

p.    Records, materials, and information that constitute evidence of identity, including but not limited to:

i.    clothing worn by GALETTO, including a black Trump baseball hat, black headband, tan jacket, a gray hoodie, and a black backpack; and

ii.   clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

q.   Records and information — including but not limited to documents, communications, e-mails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements — relating to:

i.   Any records and/or evidence revealing GALETTO's presence at the January 6, 2021, Capitol Riots;

ii.   Any physical records, such as receipts for travel, which may serve to prove evidence of travel to or from Washington D.C. from December of 2020 through January of 2021;

iii. GALETTO's (and others's) motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

iv.   GALETTO's (and others's) activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021;

r.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

s.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   evidence of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

vii. evidence of GALETTO's use or connection to social media accounts;

viii.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

ix.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and

v

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

    x. records of or information about Internet
Protocol addresses used by the device;

    xi. records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

  3. As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress KEVIN LOUIS GALETTO's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of KEVIN LOUIS GALETTO's face with his eyes open to activate the facial-, iris-, or retina-recognition

x

feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.